UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Bryan Husband,

      Plaintiff,

      v.                             Civil Action No. 2:10-CV-228

Michael J. Astrue,
Commissioner of Social Security,

      Defendant.

## REPORT AND RECOMMENDATION
### (Docs. 15, 19)

Claimant Bryan Husband brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and reversal of the decision of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits and supplemental security income.  Pending before the Court are Husband's Motion seeking an order reversing the Commissioner's decision and remanding for further proceedings (Doc. 15), and the Commissioner's Motion seeking an order affirming the same (Doc. 19).

For the reasons set forth below, I recommend that the Court DENY Husband's motion to remand (Doc. 15) and GRANT the Commissioner's motion to affirm (Doc. 19).

**Background**

Husband was 47 years old on the alleged disability onset date.  (Administrative Record ("AR") 42.)  He obtained his associate's degree in accounting in 1980 and lives with his parents, wife, and daughter.  (AR 55, 207.)  Husband applied for disability insurance benefits and supplemental security income based upon deep vein thrombosis, obesity, back and shoulder pain, depression, panic disorder, migraine headaches, asthma, sleep apnea, and renal calculi.  (AR 36-37.)

Husband worked in maintenance and property management from 1991 to 2008. (AR 203.)  He has not worked since December 8, 2008, when he alleges he became unable to work due to pain.  (AR 57, 203.)  In a 2008 Disability Report, Husband reported that he measured six feet in height and weighed 290 pounds.  (AR 201.)  He stated that he is "[i]n constant pain," he must "take[ ] time off of work because of [his] conditions," and he has "racing thoughts."  (AR 202.)  Husband reported taking the following medications:  Coumadin, Lipitor, OxyContin, Paxil, Clonopin, Celebrex, and Hydrochlorothiazide.  (AR 206, 228.)  A 2009 Disability Report stated that Husband was experiencing increased pain, depression, anxiety, and fatigue.  (AR 225-26, 230.)  He further reported that he had increased his medication dosages, and suffered a shoulder tear that required surgery.  (AR 225-26.)

In Husband's 2009 Function Report, he reported that his daily activities include taking a shower, bringing his children to and from school, light cleaning, making lunch, watching television, running errands, cooking dinner, relaxing, and going to bed.  (AR

2

209.)  Husband further reported that he helps care for family pets, is able to help with housework, and that he is not limited in performing personal care tasks.  (AR 210.) According to Husband, before his conditions worsened, he was able to "lift heavy objects, walk a distance, [and] drive without anxiety," but that he can no longer do these things.  (*Id.*)  Husband is able to prepare simple meals and has not experienced any changes in cooking habits since his conditions worsened.  (AR 211.)  With respect to other house and yard work, Husband wrote that he is able to take out the trash and walk the dogs, but that sometimes he needs help or encouragement to do these things, and that it gets harder to do them each year.  (AR 211-12.)

Husband is able to get out on his own by walking or driving himself and is able to shop on his own.  (AR 212.)  He reported spending social time with others and regularly attends high school sporting events, but he does fewer social activities than he used to due to his conditions.  (AR 213-14.)  Husband is able to finish tasks, pay attention for twenty minutes at a time, walk for ten minutes at a time, follow written and spoken directions, and get along with authority figures, but he does not handle stress well.  (AR 214-15.)

On March 11, 2009, Husband applied for a period of disability and disability insurance benefits.  (AR 34.)  On September 9, 2009, he applied for supplemental security income.  (*Id.*)  Both applications allege that Husband became disabled on December 8, 2008.  (*Id.*)  His applications were denied initially on August 5, 2009.  (*Id.*) Husband timely requested an administrative hearing, which occurred on May 27, 2010

before Administrative Law Judge ("ALJ") Dory Sutker.  (AR 49-84.)  Husband testified

at the hearing and was represented by counsel.  (AR 34.)  Vocational Expert ("VE")

Howard Steinberg was also present and testified at the hearing.  (*Id.*)

On June 3, 2010, the ALJ found that Husband was not disabled within the

meaning of the Social Security Act and was therefore not entitled to benefits.  (AR 34-

44.)  The Decision Review Board ("DRB") selected the ALJ's decision for review, and

Husband submitted additional evidence, which the DRB considered.  (AR 1.)  The DRB

affirmed the ALJ's decision, thereby rendering it the final decision of the Commissioner.

(*Id.*)  Having exhausted his administrative remedies, Husband timely filed the instant

action on October 8, 2010.  (Doc. 3.)

## **ALJ Determination**

### I.      **Five-Step Sequential Evaluation Process**

The Commissioner uses a five-step sequential process to evaluate disability

claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step

requires the ALJ to determine whether the claimant is presently engaging in "substantial

gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so

engaged, step two requires the ALJ to determine whether the claimant has a "severe

impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant

has a severe impairment, the third step requires the ALJ to make a determination as to

whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).

4

The claimant is presumptively disabled if the impairment meets or equals a listed

impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

      If the claimant is not presumptively disabled, the fourth step requires the ALJ to

consider whether the claimant's "residual functional capacity" ("RFC") precludes the

performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The

fifth and final step requires the ALJ to determine whether the claimant can do "any other

work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving

his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a

"limited burden shift to the Commissioner" to "show that there is work in the national

economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009)

(clarifying that the burden shift to the Commissioner at step five is limited, and the

Commissioner "need not provide additional evidence of the claimant's residual functional

capacity").

      Employing this five-step analysis, ALJ Sutker first determined that Husband had

not engaged in substantial gainful activity since December 8, 2008.  (AR 36.)  At step

two, the ALJ found that Husband had the following severe impairments:  "factor V

Leiden coagulopathy thrombophilia[1] status post multiple episodes of deep vein

thrombosis," obesity, back strain, left shoulder tear with surgical repair, and affective

disorder.  (*Id.*)  At step three, the ALJ found that Husband did not have an impairment or

combination of impairments that met or medically equaled any impairment contained in

---

[1] Coagulopathy thrombophilia is a disease affecting the blood's ability to clot.  STEDMAN'S
MEDICAL DICTIONARY 400, 1985 (28th ed. 2006).

the Listing of Impairments in 20 C.F.R. part 404, subpart P, appendix 1 ("the Listings").

(AR 37-39.)  Next, the ALJ determined that Husband has the RFC to perform light work[2]

except that he:

> must avoid overhead reaching with the non-dominant left upper extremity
> and the use of tools or machinery that has sharp edges or blades.  The
> claimant is limited to routine and repetitive tasks, and is limited to
> environments with no production quotas.  He must avoid unprotected
> heights, and moving mechanical parts.

(AR 39.)  The ALJ explained that, although Husband's medically determinable

impairments could reasonably be expected to cause the alleged symptoms, his statements

concerning the intensity, persistence, and limiting effects of those symptoms were "not

credible to the extent they are inconsistent with the . . . [RFC] assessment."  (AR 40.)  In

support of this credibility determination, the ALJ referenced the objective medical

evidence, the subjective factors including Husband's reported activities, and the opinion

evidence.  (AR 40-42.)

At step four, the ALJ determined that Husband is unable to perform his past

relevant work in maintenance and property management.  (AR 42.)  At step five, the ALJ

determined, based on the testimony of VE Steinberg, that considering Husband's age,

education, work experience, and RFC, there are jobs that exist in significant numbers in

the national economy that Husband can perform, such as fast food worker, mail clerk,

---

[2] Pursuant to 20 C.F.R. § 404.1567(b), "[l]ight work" involves "lifting no more than 20 pounds at
a time with frequent lifting or carrying of objects weighing up to 10 pounds."  The regulation further
explains as follows:  "Even though the weight lifted may be very little, a job is in this category when it
requires a good deal of walking or standing, or when it involves sitting most of the time with some
pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range
of light work, you must have the ability to do substantially all of these activities."

unarmed security guard, cashier, sales attendant, storage facility rental clerk, cafeteria attendant, and construction flagger.  (AR 43.)  The ALJ concluded that Husband had not been under a disability, as defined in the Social Security Act, from December 8, 2008, the alleged onset date, through the date of her decision.  (AR 43-44.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v.*

*Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial evidence" is more than a mere

scintilla; it means such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol.*

*Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

Although the reviewing court's role with respect to the Commissioner's disability

decision is "quite limited[,] and substantial deference is to be afforded the

Commissioner's decision," *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL

2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quotation marks and citation omitted), the

Social Security Act "must be construed liberally because it is a remedial statute that is

intended to include, rather than exclude, potential recipients of benefits," *Jones v. Apfel*,

66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999); *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d

Cir. 1981) ("In its deliberations the District Court should consider the fact that the Social

Security Act is a remedial statute to be broadly construed and liberally applied.").

## Analysis

Husband argues that the ALJ erred by:  (1) finding that his sleep apnea was not a

severe impairment; (2) failing to consider the effects of obesity on Husband's RFC; (3)

failing to give "significant" weight to the opinions of treating physician Roy Barnes,

M.D. (Doc. 15 at 1); (4) finding that Husband's subjective complaints of pain were not

credible; and (5) concluding that Husband can perform less than the full range of

sedentary work; and **(6)** posing improper hypothetical questions to the VE.  The

8

Commissioner asserts that the ALJ's decision is supported by substantial evidence and complies with applicable legal standards.

## I.  The ALJ's Conclusion that Husband's Sleep Apnea Is Not Severe Is Supported By Substantial Evidence.

Husband first argues that the ALJ erred by concluding that his sleep apnea was not a severe impairment.  (Doc. 15 at 5-6.)  The claimant bears the burden at step two of the sequential process of providing medical evidence demonstrating the severity of his or her condition.  *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Burgos v. Astrue*, No. 3:09-cv-1216 (VLB), 2010 WL 3829108, at *3 (D. Conn. Sept. 22, 2010).  Specifically, it is the claimant's burden to establish that his or her impairment "significantly limit[s] [his or her] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a); *see* 20 C.F.R. § 404.1520(c).  The Second Circuit has held, however, that the step two severity assessment "may do no more than screen out *de minimis* claims."  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (citing *Yuckert*, 482 U.S. at 158).  To that end, Social Security Ruling ("SSR") 85-28 provides:  "A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., *do not have more than a minimal effect on the [claimant's] physical or mental ability(ies) to perform basic work activities*."  SSR 85-28, 1985 WL 56856, at *3 (1985) (emphasis added).  The opinion further states:

> [A]t the second step of sequential evaluation it must be determined whether medical evidence establishes an impairment or combination of impairments "of such severity" as to be the basis of a finding of inability to engage in any [substantial gainful activity].  *An impairment or combination of*

> *impairments is found "not severe" and a finding of "not disabled" is made*
> *at this step when medical evidence establishes only a slight abnormality or*
> *a combination of slight abnormalities which would have no more than a*
> *minimal effect on an individual's ability to work* even if the individual's
> age, education, or work experience were specifically considered (i.e., the
> person's impairment(s) has no more than a minimal effect on his or her
> physical or mental ability(ies) to perform basic work activities). . . .

*Id.* (emphasis added) (citing 20 C.F.R. §§ 404.1520, 404.1521, 416.920(c), 416.921); *see*

*also* SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996).

Here, Husband fails to point to any evidence that his sleep apnea significantly

limits his physical or mental abilities to do basic work activities.  Although he asserts he

suffers from "daytime fatigue," he concedes that this condition may arise as a result of his

obesity (an impairment which the ALJ found to be severe) or the side effects of his

medications.  (Doc. 15 at 5; AR 37.)  That Husband's fatigue may not be caused by his

sleep apnea is supported by the treatment notes of Dr. Barnes.  On November 28, 2006,

Dr. Barnes noted that his "[i]mpression" was:  "Fatigue, etiology unknown.  I believe this

is multifactorial."  (AR 354.)  Further, Husband concedes that the medical evidence he

submitted "showed" that his "obstructive sleep apnea [was] successfully treated with

CPAP."[3]  (Doc. 15 at 6; AR 11.)  Husband points to other medical evidence noting that

he was "still having trouble sleeping and trouble using his [CPAP] machine."  (AR 352.)

Nevertheless, this evidence, by itself, does not establish that the "trouble" he was having

---

[3] CPAP is an abbreviation for continuous positive airway pressure.  STEDMAN'S MEDICAL
DICTIONARY 454 (28th ed. 2006).

10

resulted in a limited ability to do basic work activities such that his sleep apnea should have been found to be a severe impairment.

Moreover, based on Husband's testimony, the ALJ concluded that "lack of treatment as well as non-compliance is strong evidence that [sleep apnea] is not severe." (AR 37.)  This conclusion is supported by substantial evidence.  Specifically the ALJ asked Husband at his hearing:

> Q  And [physicians] had prescribed a CPAP for you?
>
> A  Yes.
>
> Q  Okay.  Do you use that?
>
> A  I did for a few years and then it got so that, I don't know, like everyone else, it's just it's a pain in the neck to put it on and off every night.  I still have the machine and, when things get bad, I'll still put it on here and there.

(AR 62.)  In addition, a 2009 treatment note further documented that Husband reportedly did not use his CPAP machine.  (AR 528.)

Finally, treatment notes from Upper Valley Neurology and Neurosurgery, submitted to the DRB after the ALJ's decision, further support the conclusion that Husband's sleep apnea is not severe.  The most recent notes indicated that Husband "feels better" (AR 9) and that his treatment with the CPAP machine was successful (AR 11).  Dr. Barnes noted on June 23, 2009 that Husband "denies any trouble sleeping, retiring at 10 p.m. and awakening daily at 6 a.m." (AR 548.)  No treatment notes documented any complaints of functional limitations.

In any event, even if the ALJ erroneously determined at step two that Husband's sleep apnea was not a severe impairment, any such error in this case would be harmless. In many cases, courts find that error at step two is harmless when the ALJ finds other severe impairments at step two and proceeds through the sequential evaluation process. *See, e.g.*, *Bender v. Astrue*, No. 09-CV-880 (TJM/VEB), 2010 WL 5175023, at *4 (N.D.N.Y. Nov. 29, 2010) (citing cases). The reasoning for this is that, because the ALJ is required to consider both severe and non-severe impairments in determining RFC, any functional limitations arising from a non-severe impairment will ostensibly still be reflected. *See id.*; 20 C.F.R. § 404.1520(a)(4)(ii); *Bigwarfe v. Comm'r of Soc. Sec.*, No. 7:06- CV-1397 (LEK/DRH), 2008 WL 4518737 (N.D.N.Y. Sept. 30, 2008) ( "Where a claimant alleges multiple impairments, the combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity." (citations omitted)).

Here, although the ALJ concluded that Husband's sleep apnea was not severe, she found that he had other severe impairments, including "factor V Leiden coagulopathy thrombophilia status post multiple episodes of deep vein thrombosis," obesity, back strain, left shoulder tear with surgical repair, and affective disorder. (AR 36.) The ALJ then proceeded to consider all of Husband's impairments, both severe and non-severe, in determining that he retained the RFC for less than the full range of light work. Specifically, the ALJ found that Husband "must avoid . . . the use of tools or machinery that has[ve] sharp edges or blades," unprotected heights, and moving mechanical parts.

12

(AR 39.)  She further limited him to routine and repetitive tasks in environments with no

production quotas.  (*Id.*)  Such limitations would account for Husband's alleged

functional limitations arising out of sleep apnea.

## II.     The ALJ Properly Considered Obesity In Determining Husband's RFC.

Husband next argues that the ALJ failed to consider his obesity in determining his

RFC.  Social Security Ruling 02-01p instructs the ALJ to consider the effects of obesity

at each step of the evaluation process, including during the assessment of a claimant's

RFC.  SSR 02-01p, 2000 WL 628049, at *1, 6 (Sept. 12, 2009) ("The combined effects

of obesity with other impairments may be greater than might be expected without

obesity.  For example, someone with obesity and arthritis affecting a weight-bearing

joint may have more pain and limitation than might be expected from the arthritis

alone.").  The Listings do not include a listing for obesity; however, obesity can be a

severe impairment if it "significantly limits an individual's ability to do basic work

activities."  *Id.* at *4.  The Sixth Circuit has observed that it is "a mischaracterization to

suggest that Social Security Ruling 02-01p offers any particular procedural mode of

analysis for obese disability claimants."  *Bledsoe v. Barnhart*, 165 F. App'x 408, 412

(6th Cir. 2006).  Rather the standard is simply that, like any other physical or mental

malady, "an ALJ must meaningfully consider the effect of a claimant's obesity,

individually and in combination with her impairments, on workplace function at step

three and at every subsequent step."  *Diaz v. Comm'r*, 577 F.3d 500, 504 (3d Cir.

2009).

In this case, the ALJ explicitly considered obesity in finding that Husband retained the RFC for less than the full range of light work.  Indeed, the ALJ determined that Husband's obesity, by itself, was a severe impairment.  (AR 36.)  In assessing Husband's RFC, the ALJ necessarily considered all of Husband's medically determinable impairments, including his obesity.  20 C.F.R. § 404.1545(a)(2).  Further, the ALJ considered and cited the opinions of Dr. Barnes and state agency consultant Dr. Burton Nault in making his RFC finding, and these physicians took obesity into account in their opinions.  (AR 41, 337-67, 426, 544-48); *see Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 443 (6th Cir. 2010) (concluding that the ALJ properly considered obesity in determining a claimant's RFC by utilizing opinions of physicians who accounted for obesity); *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("[A]lthough the ALJ did not explicitly consider [the claimant's] obesity, it was factored indirectly into the ALJ's decision as part of doctors' opinions."); *Herod v. Astrue*, No. 06-CV-0767, 2008 WL 3155161, at *9 (W.D.N.Y. Aug. 4, 2008) (finding that because the ALJ found obesity to be a severe impairment, "it is evident that plaintiff's obesity was factored into [the ALJ's] RFC determination"); *Guadalupe v. Barnhart*, No. 04 CV 7644 HB, 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005) ("When an ALJ's decision adopts the physical limitations suggested by reviewing doctors after examining the Plaintiff, the claimant's obesity is understood to have been factored into their decisions.").

14

The conclusion that the ALJ properly considered obesity in this case is consistent with this Court's Opinion and Order in *Macaulay v. Astrue*, 262 F.R.D. 381, 388-90 (D. Vt. 2009). There, the claimant alleged obesity as an impairment; obesity was discussed at the hearing before the ALJ; and the record was "replete with references" to the claimant's obesity. *Id.* at 387. Yet, the ALJ's decision denying Macaulay benefits "did not make any specific findings as to whether [the claimant was] obese and, if so, whether her obesity [was] severe." *Id.* (quotation omitted). This Court reversed and remanded on the basis that "the ALJ committed legal error by completely ignoring SSR 02-01p" and by failing to consider the effects of the claimant's obesity at any stage of his analysis. *Id.* In arguing for a different result, the Commissioner asserted that the record evidence did not demonstrate a significant limitation caused by Macaulay's obesity, and that, as a result, obesity was effectively "factored into the ALJ's RFC determination." *Id.* at 389. Although this Court rejected that argument, it acknowledged that the Commissioner's decision "is not without legal support" and that "this argument would be more persuasive in slightly different circumstances." *Id.* One of the circumstances suggested was "a case in which the ALJ took notice of the claimant's obesity as an impairment." *Id.* This is precisely the circumstance at issue with respect to Husband, given that the ALJ found Husband's obesity to be a severe impairment.

Moreover, treating physicians' notes documented Husband's obesity, yet the medical evidence does not support that Husband had any additional functional

15

limitations arising from his obesity.  (AR 16, 18, 337-67, 427, 429, 544-48.)  To the

contrary, Husband was urged by Dr. Barnes to be more active.  (AR 340, 342.)   And a

pain consultation from 2010 noted that Husband had a normal gait with normal steps

and a negative straight leg test bilaterally.  (AR 553.)

     Husband's contention that his "obesity clearly must have contributed to" fatigue,

"lack of stamina to lift or bend," and difficulty concentrating does not require a

different result.  (Doc. 15 at 8.)  First, as noted above, the cause of Husband's alleged

fatigue is not clear from the record.  (AR 354.)  Second, the RFC for less than the full

range of light work does not require lifting of more than twenty pounds at a time and

does not appear to require bending.  (AR 39.)  Third, there is little indication in the

record that Husband suffers from difficulty concentrating to such an extent that he is

functionally limited.  In his Function Report, Husband stated that he is able to pay

attention for twenty minutes, finish what he starts, and follow written and spoken

directions.  (AR 214.)  State agency consultant J. Coyle, Ph.D. opined that Husband had

only mild difficulty in maintaining concentration, persistence, or pace.  (AR 443.)

Francis Warman, Ph.D. completed a Comprehensive Psychological Profile which

concluded that Husband "demonstrated an adequate ability to concentrate and focus on

tasks . . . [l]imitations are absent or minimal."  (AR 429.)

## III.    The ALJ Properly Evaluated Dr. Barnes's Opinions.

     Husband next argues that the ALJ should have given controlling weight to the

opinions of his primary care physician, Dr. Barnes.  The "treating physician rule"

provides that the ALJ must give a treating physician's opinion as to the claimant's

disability "controlling weight," so long as that opinion is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2); *see Green-*

*Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).  Conversely, a treating physician's

opinion is not controlling where it is contrary to other substantial evidence in the record,

including the opinions of other medical experts.  *Halloran v. Barnhart*, 362 F.3d 28, 32

(2d Cir. 2004).  Where conflicts arise in the form of contradictory medical evidence, their

resolution is properly entrusted to the Commissioner.  *Veino v. Barnhart*, 312 F.3d 578,

588 (2d Cir. 2002).

When a treating physician's opinion is not given controlling weight, the opinion is

still entitled to *some* weight, given that such physician "[is] likely to be the medical

professional[ ] most able to provide a detailed, longitudinal picture of [the claimant's]

medical impairment(s) and may bring a unique perspective to the medical evidence that

cannot be obtained from the objective medical findings alone or from reports of

individual examinations, such as consultative examinations or brief hospitalizations."  20

C.F.R. § 404.1527(d)(2).

Under the Commissioner's regulations, the ALJ must consider the following

factors when assigning weight to the opinion of a treating source: "(1) the length of the

treatment relationship and the frequency of examination; (2) the nature and extent of the

treatment relationship; (3) whether the treating physician presents relevant evidence to

support an opinion, particularly medical signs and laboratory findings; (4) whether the treating physician's opinion is consistent with the record as a whole; (5) whether the treating physician is a specialist in the area relating to her opinion; and (6) other factors which tend to support or contradict the opinion."  *Richardson v. Barnhart*, 443 F. Supp. 2d 411, 417 (W.D.N.Y. 2006) (citing *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000)); 20 C.F.R. § 404.1527(d)(2)-(6)); *see Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (holding that, in deciding what weight to accord to medical opinions, the ALJ may consider a variety of factors, including "[t]he duration of a patient-physician relationship, the reasoning accompanying the opinion, the opinion's consistency with other evidence, and the physician's specialization or lack thereof").

Here, the treating physician rule does not require the ALJ to have given controlling weight to Dr. Barnes's opinions.  The ALJ found that Dr. Barnes's opinions with respect to Husband's functional limitations should be given "limited weight, as they are not supported by the evidence on record."  (AR 41.)

Dr. Barnes opined that Husband is able to lift up to ten pounds occasionally, sit for two hours and walk or stand for one hour each during an eight-hour work day.  (AR 570.) He identified no medical or clinical findings in support of this assessment.  (*Id.*)  Dr. Barnes further opined that Husband is never able to use his left hand and never able to climb ladders or crawl.  (AR 571, 572.)  He also stated that Husband should never be exposed to unprotected heights or moving mechanical parts.  (AR 573.)

Although the ALJ stated that she gave limited weight to Dr. Barnes's opinions, it is clear from the RFC adopted that she in fact fully credited certain portions of Dr. Barnes's medical source statement.  The RFC as adopted provides that Husband can perform light work,[4] except that he:

> must avoid overhead reaching with the non-dominant left upper extremity and the use of tools or machinery that has sharp edges or blades.  The claimant is limited to routine and repetitive tasks, and is limited to environments with no production quotas.  He must avoid unprotected heights, and moving mechanical parts.

(AR 39.)  Thus Dr. Barnes's opinions that Husband is never able to climb ladders or crawl and that Husband should never be exposed to unprotected heights or moving mechanical parts were fully adopted by the ALJ.  (AR 39, 571-73.)

The ALJ's decision not to give great weight to Dr. Barnes's opinions regarding Husband's left hand functional limitations is supported by substantial evidence.  As the ALJ correctly noted, the record contains no evidence that Husband is at all limited in his handling, fingering, and feeling abilities, despite Dr. Barnes's opinion that Husband can never do these activities.  To the contrary, in his Function Report, Husband failed to report any functional limitations related to his left arm.  He reported that he helps care for family pets, is able to help with housework, and that he is not limited in performing personal care tasks.  (AR 210.)  Moreover, Husband reported that he is able to prepare

---

[4] Pursuant to 20 C.F.R. § 404.1567(b), "[l]ight work" involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  The regulation further explains as follows:  "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  *Id.*

simple meals and has not experienced any changes in cooking habits since his conditions worsened.  (AR 211.)  With respect to other house and yard work, Husband wrote that he is able to take out trash and walk the dogs, but that sometimes he needs help or encouragement to do these things, and that it gets harder to do them each year.  (AR 211-12.)  In addition, Dr. Nault's physical RFC opined that Husband has no manipulative limitations.  (AR 422-23.)

The ALJ's decision not to give great weight to Dr. Barnes's opinions is further supported by Husband's 2009 physical therapy treatment notes for his shoulder.  (AR 447-52.)  Although initial intake notes document Husband's complaint of "decreased functional ability," during four weeks of physical therapy, Husband's progress was noted to be good.  (AR 447, 450, 452.)  He was noted to have decreased pain, good progress, and good response to PT interventions.  (AR 452.)  Follow-up treatment notes after arthroscopic surgery with John Houde, M.D., the referring treating orthopedist, noted that Husband showed improvement, and by August 17, 2009, Dr. Houde wrote that Husband was "overall doing very well."  (AR 454, 457.)

While Dr. Barnes does have a lengthy and consistent treating relationship with Husband, the ALJ's decision not to credit some of Dr. Barnes's opinions is further supported by Dr. Barnes's failure to note any particular medical or clinical findings in support of his assessment.  In support of his opinion that Husband was never able to use his left arm, Dr. Barnes stated only that "[a]rm diagnosis unclear – currently in w/[ ] Pain Clinic."  (AR 571.)  This note by Dr. Barnes indicates that Husband's arm pain was

20

referred to treatment by a specialist with the Pain Clinic.  Pain Clinic treatment notes do not document any inability with respect to Husband's left arm usage, but instead note that Husband has 5/5 strength in all muscle groups bilaterally, full range of motion in the joints, and a normal shoulder shrug.  (AR 554.)  Dr. Barnes's treatment notes documented shoulder pain one time, but the pain was noted to be in Husband's right shoulder.  (AR 337.)  The only other time his notes reflect complaints of shoulder or arm-related pain, there is no indication on which side the pain originated.  (AR 338.)

Similarly, the ALJ's decision not to adopt Dr. Barnes's opinions regarding Husband's limited abilities to sit, stand, and walk are also supported by substantial evidence.  State agency consultant Dr. Nault opined that Husband can sit, stand, or walk with normal breaks for about six hours in an eight-hour workday.  (AR 420.)  As noted above, in his treatment notes, Dr. Barnes imposed no restrictions on Husband's activities, and instead encouraged Husband to be more active.  (AR 340, 342.)

## IV.  The ALJ's Determination That Husband Was Not Fully Credible Is Supported by Substantial Evidence.

Husband next argues that the ALJ erred in her credibility determination.  SSR 96-7p sets forth the evidence that the ALJ must consider in assessing the credibility of a claimant's statements about his or her symptoms.  SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996).  The ruling states:

> In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or

> psychologists and other persons about the symptoms and how they affect
> the individual, and any other relevant evidence in the case record.

*Id.* The ruling further provides that the ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at *2.

Additionally, when determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account. 20 C.F.R. § 416.929; *see McLaughlin v. Sec'y of Health, Educ. & Welfare*, 612 F.2d 701, 704-05 (2d Cir. 1980). But the ALJ is not required to accept the claimant's subjective complaints without question; in fact, the ALJ may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record. *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). It is the province of the Commissioner, not the reviewing court, to "appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). If the Commissioner's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints. *Id.* (citing *McLaughlin*, 612 F.2d at 704).

In assessing Husband's credibility, the ALJ set forth specific reasons for her conclusions that were sufficiently clear. First, she found that the medical evidence "fails to fully support the allegations" of shoulder pain. (AR 40.) In support of this conclusion, the ALJ noted that the evidence indicates that Husband's shoulder surgery was "fairly

successful" and that "[o]nly one month after surgery, [he] reported that he was doing very well and was pleased with the results." (*Id.*)  The ALJ's conclusions are supported by the record.  Dr. Houde, Husband's treating orthopedist, noted that Husband was making good progress in recovering after surgery and that his functioning was improving.  (AR 454.) Two weeks after surgery, he was reportedly "doing very well.  [Husband] is very pleased with his progress." (AR 457.)  One month after the surgery, Husband was "able to tolerate 90 degrees of forward flexion and 90 degrees of abduction."  (AR 454.)  He was also "able to tolerate passive internal and external rotation 65 to 70 degrees without much discomfort."  (*Id.*)

Second, with respect to back pain, the ALJ reached the same conclusion that Husband's alleged pain was not credible, specifically noting that "[t]he record is devoid of medical evidence which supports the claimant's alleged severe back pain."  (AR 40.) The ALJ then cited to and discussed the records of Husband's pain clinic consultation. (AR 552-56.)  These records provide substantial evidence supporting the conclusion that Husband's alleged back pain is not of disabling severity.  Moreover, Husband was observed to have a normal gait with normal steps, normal spine curvature, negative straight leg testing, normal sensation, normal muscle strength, and negative Babinski testing.  (AR 364-66, 552-56.)  Although Dr. Barnes's treatment notes documented that Husband complained of low back pain in late 2005 and early 2006, these treatment notes pre-date Husband's alleged onset date by nearly three years, at which point Husband was

still working full-time.  (AR 364-66.)  Further, in December 2009, Dr. Barnes noted

generally that Husband's "[c]hronic pain seems to be . . . managed currently."  (AR 545.)

       Third, regarding Husband's allegations of fatigue arising from his sleep apnea,

the ALJ concluded that "the records indicate that [Husband] received no treatment for

this condition and made no complaints of the symptoms alleged at the hearing."  (AR 40.)

While the record does show that Husband did complain of fatigue, the conclusion that

fatigue was not necessarily attributable to the sleep apnea is supported by the record as

discussed above.  (AR 37, 354, 548.)

       Contrary to Husband's assertions, in assessing Husband's credibility, the ALJ did

not unfairly characterize Husband's reported daily activities.  In fact, Husband's reported

daily activities were fairly broad.  Although he reported being more limited in some

respects than he used to be, he reported being able to walk for ten minutes at a time,

travel by himself by walking or driving, and prepare meals a few times each week.  (AR

211-13.)  Husband specifically noted that if he does not prepare his own meals, it is

because "we take turns in the house," further supporting the conclusion that he is capable

of helping himself and others.  (AR 211.)  In reporting the extent to which he helps with

his pets, Husband specifically wrote that he "feed[s] them and water[s] them and take[s]

them outside" but that his "daughter walks the dogs," indicating that he has the ability to

manage some of the pet care on his own.  (AR 210.)  Inconsistently, on a separate page,

Husband wrote that, although it causes him some difficulty some times, he is able to walk

the dogs.  (AR 211-12.)  Husband also reported that he takes responsibility for

transporting his children to and from school.  (AR 209.)

Without question, the record shows that Husband suffers from pain.  "But,

disability requires more than mere inability to work without pain.  To be disabling, pain

must be so severe, by itself or in conjunction with other impairments, as to preclude any

substantial gainful employment."  *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir.

1983).  In short, the medical evidence of record and Husband's reported activities provide

substantial evidence supporting the ALJ's conclusion that Husband's complaints of

disabling pain are not entirely credible.  In reaching this conclusion, it is apparent that the

ALJ's analysis shows that she considered Husband's complaints of pain and the record as

a whole, and that she properly set forth specific reasons for her finding that Husband was

not credible.

**V.   The ALJ's RFC Determination Is Supported By Substantial Evidence and The Hypothetical Questions Posed to the VE Were Not Improper.**

Finally, Husband argues that the ALJ erred by concluding that he retains the RFC

to perform less than the full range of light work.  In support of this argument, Husband

asserts that the VE testimony does not support the RFC because the ALJ failed to include

certain evidence of Husband's alleged impairments in posing hypotheticals to the VE.

(Doc. 15 at 15-17; AR 76-80.)  Specifically, he contends that the hypotheticals should

have included purported limitations documented by Dr. Barnes.  (AR 570, 573, 577.)

Husband further contends that the ALJ should have posed a hypothetical to the VE based

upon the opinions of examining consultative psychologist Dr. Warman.

25

A VE's testimony is useful at step five of the sequential evaluation when "it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job." *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981). VE testimony may not support the ALJ's RFC determination when the hypotheticals "ask a [VE] to assume a particular physical capability on the part of the claimant . . . where there was no evidence to support the assumption underlying the hypothetical." *Dumas*, 712 F.2d at 1554.

At the hearing, the ALJ first asked the VE:

I want you to assume that the individual is limited to light work . . . except the individual would have to avoid overhead reaching with the non-dominant left upper extremity and would have to avoid the use of tools or machinery that had sharp edges or blades. In addition, I want you to assume that the individual would be limited to routine tasks and would be limited to environments with no production quotas.

(AR 76.) Next, the ALJ asked the VE "to assume the same as the first but in addition, I want you to assume the individual would have to avoid unprotected heights and moving mechanical parts." (AR 78.) Third, the ALJ asked the VE "to assume the same as number two but in addition, . . . reaching in other directions would be limited to occasional with the left non-dominant upper extremity." (AR 79.) For the fourth hypothetical, the VE was asked "to assume the same as number two . . . but this time I want you to assume that the non-dominant arm could be used solely as an assist." (*Id.*) In response to each hypothetical, the VE opined that there were specific jobs that existed in the national economy that the hypothetical individual could perform.

26

The hypotheticals posed to the VE in this case were based upon Husband's limitations and capabilities as supported by evidence in the record. As noted above, the record supports the ALJ's assumption that Husband can perform a limited range of light work. As also discussed above, the ALJ properly concluded that Husband's alleged limitations arising out of his back, arm, and shoulder pain were not fully credible, and that Husband's activities of daily living were fairly broad. In particular, with respect to the use of his left arm, it is noteworthy that Husband's Function Report stated that he is able to prepare simple meals and has not experienced any changes in cooking habits since his conditions worsened. (AR 211.) The VE was not asked any hypotheticals that assumed a particular physical capability without evidentiary basis in the record.

The ALJ's failure to include the specific limitations asserted by Husband in the hypotheticals was not error. As noted above, the ALJ decided not to credit Dr. Barnes's opinion that Husband can walk and stand for only one hour each day and that Husband can lift only up to ten pounds. As set forth in Section III, the ALJ's conclusions regarding Dr. Barnes's opinions are supported by substantial evidence. Thus, the ALJ did not err in failing to include these limitations in a hypothetical to the VE.

Similarly, the ALJ was not required to include a hypothetical based on Dr. Warman's opinion that Husband's psychological ability to function is "limited but not precluded." (AR 429.) There is ample evidence in the record to support the conclusion that Husband's mental impairments were not so severe as to have a significant effect on his RFC. For example, in January 2009, Dr. Barnes noted that Husband's anxiety had

27

dropped dramatically, and that it was apparently well-managed with an increased dosage of Paxil.  (AR 339.)  In addition, Dr. Coyle noted in his 2009 Psychiatric Review Technique that although Husband suffered from affective disorder, depressive disorder, panic disorder, and anxiety-related disorder, these impairments were not severe.  (AR 433, 436, 438.)  Mostly consistent with Dr. Warman's opinions, Dr. Coyle opined that Husband had only mild restrictions in activities of daily living, and mild difficulty in maintaining social functioning; mild difficulty in concentration, persistence or pace; and no episodes of decompensation.  (AR 443.)  Consistent with Dr. Barnes's notes, Dr. Coyle concluded that Husband's mental impairments respond well to medications.  (AR 445, 544.)

## Conclusion

ALJ Sutker conducted a proper analysis of  Husband's claims in a comprehensive fashion.  She cited substantial evidence to support her findings and discussed the opinions of the relevant medical providers, whether treating or consulting.  For these reasons and the other reasons stated herein, I recommend the Commissioner's motion (Doc. 19) be GRANTED, and Husband's motion (Doc. 15) be DENIED.

28

Dated at Burlington, in the District of Vermont, this 5th day of August, 2011.


/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge



Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation.  *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).